**UNITED STATES**

**v.**

**Terrence L. JONES, 464 73 7260 Seaman Recruit (E–1), U.S. Navy.**

**NMCM 90 3112.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 13 June 1990.

Decided 28 Feb. 1992.

LCDR Richard D. Zeigler, JAGC, USNR,
Appellate Defense Counsel.

LT K.S. Anderson, JAGC, USNR, Appellate Government Counsel.

Before STRICKLAND, ORR and MOLLISON, JJ.

MOLLISON, Judge:

Contrary to his pleas, the appellant was found guilty of conspiracy to commit aggravated assault, unauthorized absence, wrongful use of marijuana, simple arson, and aggravated assault in violation of Articles 81, 86, 112a, 126 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 886, 912a, 926, 928, respectively. A general court-martial composed of a military judge sitting alone sentenced the appellant to confinement for 10 months, total forfeitures, and a bad-conduct discharge. The convening authority approved the sentence without modification. The appellant asserts eight errors have been committed in his court-martial.[1] Among other things, the assignments of error concern the staff judge advocate's pretrial advice to the convening authority, the admission of the appellant's pretrial statement, the trial of the appellant *in absentia,* and the sufficiency of the proof. All are without merit.

## *The Pretrial Advice*

 Before a convening authority may direct the trial of any charge by general court-martial, he must refer the charge to his staff judge advocate for consideration and advice. Article 34(a), UCMJ, 10 U.S.C. § 834(a); Rule for Courts–Martial (R.C.M.) 406(a), Manual for Courts–Martial (MCM), United States, 1984. The advice of the staff judge advocate must be written and signed by the staff judge advocate. Article 34(b), UCMJ, 10 U.S.C. § 834(b); R.C.M. 406(b). These requirements, however, may be waived by the accused. Article 36, UCMJ, 10 U.S.C. § 836; R.C.M. 601(d)(2). Objections based on defects in the referral of charges to trial must be raised before pleas are entered and a failure to do so waives the issue on appeal. R.C.M. 905(b), (e); *United States v. Ragan,* 14 U.S.C.M.A. 119, 33 C.M.R. 331 (1963). In any case, on appeal the accused must demonstrate prejudice as a result of a claimed defect. *United States v. Murray,* 25 M.J. 445 (C.M.A. 1988); *United States v. Hardin,* 7 M.J. 399 (C.M.A.1979). In the appellant's case the Article 34 pretrial advice was signed by the convening authority's assistant staff judge advocate. The appellant did not object at trial, but now claims it was error for the pretrial advice not to have been signed by *the* staff judge advocate. The term "staff judge advocate" means "the principal legal advisor of a command in the Navy ... who is a judge advocate." R.C.M. 103(17). We need not, however, consider whether an assistant staff judge advocate's signature on the pretrial advice is a defect inasmuch as the appellant waived the issue by failing to object prior to entry of his pleas. Moreover, the appellant fails to demonstrate how he was prejudiced in this respect. *See also United States v. Self,* 44 C.M.R. 612

---

1. I. THE MILITARY JUDGE ERRED BY FINDING THAT THE APPELLANT'S ABSENCE FROM POST–ARRAIGNMENT TRIAL SESSIONS WAS VOLUNTARY.
II. THE MILITARY JUDGE ERRED BY ACCEPTING, IN THE ABSENCE OF APPELLANT, STIPULATIONS IN THE FORM OF AVERMENTS OF COUNSEL.
III. APPELLANT WAS DENIED A SPEEDY TRIAL UNDER R.C.M. 707 WHERE THE RECORD INDICATES APPELLANT WAS IN PRETRIAL CONFINEMENT FOR 101 DAYS.
IV. THE MILITARY JUDGE ERRED BY DENYING THE DEFENSE MOTION TO SUPPRESS APPELLANT'S STATEMENT TO NAVAL INVESTIGATIVE SERVICE SPECIAL AGENTS WHERE THE STATEMENT WAS THE RESULT OF THREATS, COERCION AND UNFULFILLED PROMISES. [Footnote omitted.]

V. THE EVIDENCE WAS NOT SUFFICIENT TO PROVE APPELLANT GUILTY BEYOND A REASONABLE DOUBT OF CHARGES I, IV, AND V AND THEIR RESPECTIVE SPECIFICATIONS.
VI. THE CONVENING AUTHORITY ERRED BY FAILING TO IDENTIFY IN HIS ACTION, AND PRESUMABLY FAILING TO CONSIDER, THE COMPANION CASE.
VII. THE ARTICLE 34 ADVICE WAS DEFECTIVE IN THAT THE CONVENING AUTHORITY'S STAFF JUDGE ADVOCATE DID NOT PERSONALLY SIGN IT. [Footnote omitted.]
VIII. APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL DUE TO TRIAL DEFENSE COUNSEL'S FAILURE TO RAISE A SPEEDY TRIAL MOTION AND HER FAILURE TO CALL AN EXCULPATORY EXPERT WITNESS.

(A.C.M.R.1971); *United States v. Herrington,* 33 C.M.R. 814 (A.F.B.R.1963).

### The Pretrial Statement

 Subject to certain exceptions, an involuntary statement may not be received in evidence against an accused who made the statement if the accused makes a timely motion to suppress. Mil.R.Evid. 304(a). A statement is "involuntary" if it is obtained in violation of the self-incrimination privilege or the due process clause of the Fifth Amendment of the United States Constitution, Article 31, UCMJ, 10 U.S.C. § 831, or through the use of coercion, unlawful influence, or unlawful inducement. Mil.R.Evid. 304(c)(3). A motion to suppress a pretrial statement must be made prior to entry of pleas. R.C.M. 905(b)(3), (e); Mil. R.Evid. 304(d). Once an appropriate motion has been made by the defense to suppress a pretrial admission as being involuntary, the prosecution has the burden of establishing the admissibility of the statement, and the military judge must find by a preponderance of the evidence that the pretrial statement was voluntarily made before he may receive it in evidence. Mil. R.Evid. 304(e). When a specific motion to suppress has been made, the prosecution's burden extends only to those grounds upon which the defense moved to suppress the statement. *Id.* When factual issues are involved in ruling on the motion, the military judge must state his essential findings on the record. R.C.M. 905(d); Mil.R.Evid. 304(d)(4).

The appellant was charged with conspiracy to commit aggravated assault, aggravated assault and arson, all arising out of a barracks fire late in the evening of 12 February 1990. The essence of these charges was that the appellant and another sailor, Seaman Recruit Foggy, set fire to a bunk then occupied by a sleeping sailor. The sailor escaped unharmed, but the bedding was destroyed. The appellant made a sworn, pretrial statement to a special agent of the Naval Investigative Service (NIS).

In it the appellant stated that he had spilled lighter fluid in the barracks, but before he could clean it up, SR Foggy set it afire. The appellant became scared and threw the lighter fluid container out a window. Citing the due process clause of the Fifth Amendment, the appellant moved at trial to suppress this pretrial statement on grounds the statement was involuntarily made. The appellant specifically contended that during the course of the NIS interrogation from which his statement emerged, the appellant was physically mistreated, was threatened with 20 years confinement if he did not make a statement, was falsely informed that Foggy had "fingered" the appellant as the sole perpetrator of the crime, and was locked in an outdoor courtyard and subjected to the elements for 20 minutes. Additionally, the appellant contended that he was intoxicated at the time he signed the statement.

 At a pretrial evidentiary hearing conducted pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a), the Government called NIS Special Agent Weimer who testified as follows:

On 13 February 1990, he interviewed the appellant as a suspect in the fire. The interview took place in a well-lit, 10 feet by 5 feet interior room at the NIS office at Naval Training Center, San Diego, California. The appellant was escorted to the interrogation room in handcuffs by station security, however, he was released from the cuffs after he arrived. Special Agent Weimer informed the appellant he was suspected of aggravated arson. The appellant was in custody and was suspected of an offense. Accordingly, he was informed of the customary suspect's rights.[2] The agent's interview log reflects the appellant entered the interrogation room at 1626 and the advisement began immediately. The appellant waived his rights in writing at 1636. At first the appellant denied involvement, however, by 1645 he verbally admitted his participation. Special Agent Weimer

---

2. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *United States v. Tempia,* 16 U.S.C.M.A. 629, 37 C.M.R. 249 (1967); Article 31(b), UCMJ, 10 U.S.C. § 831(b); Mil.R.Evid. 305.

typed the appellant's written statement. Special Agent Weimer commenced taking the appellant's written statement at 1718 and the appellant signed the written statement at 1845. The appellant was alert and cooperative. He spoke clearly and appeared to be intelligent. He did not appear to suffer from any impairments and the odor of alcohol was not detected on the appellant's breath. The appellant did not appear intoxicated and never stated that he was intoxicated. The appellant never requested to terminate the interview or have the assistance of counsel. Special Agent Weimer did not talk in one tone to the appellant, but he never yelled at him. The appellant requested and received two smoke breaks—one from 1658 to 1707 and the other from 1758 to 1808. Because smoking is not allowed in the building, these breaks were taken out-of-doors in the courtyard of the NIS building. That building is a one-story, rectangular building with an open, interior courtyard. One door leads to the courtyard. The courtyard door is kept locked for security reasons; therefore, the appellant was allowed to take his smoke breaks in the courtyard, but the door was locked behind him. The weather was neither cold nor hot. On at least one smoke break the appellant did not take his coat with him. When he finished smoking, the appellant knocked on the door, was let back in and the interview resumed. After the appellant read the statement typed by Special Agent Weimer, he added some words, initialed corrections and signed it.[3] During the course of the interview, the appellant asked Special Agent Weimer what the maximum sentence was for the offense. After Special Agent Weimer consulted an NIS publication, he informed the appellant the maximum was 20 years confinement.[4] Special Agent Weimer also stated that on possibly more than one occasion he told the appellant that Foggy had implicated the appellant. Special Agent Weimer admitted the representation concerning Foggy's "ratting" on the appellant was false. Special Agent Weimer also admitted he had used this interview technique in order to prod the appellant—"to get him to talk."

The appellant, a 20–year old male, testified as follows:

In the late afternoon of 13 February 1990, he left base and purchased cough medicine for his cold. On the way back he met a friend he knew only by the name of Doug. Doug gave the appellant a lift back to the base pool hall. On their way back, Doug stopped at a liquor store and purchased whiskey. The appellant consumed approximately 10 ounces of the whiskey in a paper cup. During the next two-hour period at the pool hall the appellant consumed five cans of beer. The appellant was picked up at the pool hall by station security and escorted to the NIS office where he was interrogated by Special Agent Weimer. When he was picked up by security, he was intoxicated and was not thinking too clearly. During the interview, Special Agent Weimer threatened the appellant with 20 years if he did not make a statement. Contrarily, if he made a statement, Special Agent Weimer said he would be released to his barracks. Special Agent Weimer repeated this statement throughout the whole time the appellant was there. He also told the appellant quite a

---

**3.** Special Agent Weimer also took two photographs of the appellant at the time of the interview. Those photographs were made a part of the record of trial and are evidence of the appellant's appearance.

**4.** This advisement was accurate. MCM, Part IV, ¶ 52e(1). The agent stated he advised the appellant of aggravated arson because the bed that was ignited was occupied at the time. *See* Article 126(a), 10 U.S.C. § 926(a). We attach no significance to the fact that the appellant was ultimately tried for simple arson carrying a

maximum authorized punishment of one year confinement. At the early stages of the investigation, it was prudent for Special Agent Weimer to advise the appellant of the most serious of the offenses that he was suspected of committing. It follows logically that when the agent responded to the question of the appellant, he would respond with the punishment for that offense. Had the agent stated some other punishment, he would have been vulnerable to a claim that he understated or misinformed the appellant as to the potential consequences of an admission.

few times that Foggy was in the next room making a statement in essence indicating the appellant had set the fire. The appellant denied asking to smoke. Nonetheless, he was taken to the courtyard where he smoked a cigarette. The appellant was in the courtyard 20 minutes. He knocked on the door seven or eight times to get his jacket, but no one answered. After that, the appellant was taken back into the little interrogation room. With respect to his statement, he was then told to "initial here, here and here and sign here." Again he was told that if he initialed on the places on the statement, he would be released back to his barracks. The appellant complied because he was not thinking clearly and did not want to do 20 years. The appellant testified he was scared and did not tell the agent he was drunk because he had been drinking in an unauthorized area.

The appellant demonstrated in court he was capable of reading. He admitted he signed the waiver of rights form which states he waived his rights freely and voluntarily and that no promise or threats were made to him. He also admitted that he was advised of his right to counsel and his right to terminate the interview; that he understood these rights at the time; that he never requested counsel; and that, he never requested to terminate the interview. Finally, the Government called the petty officer who transported the appellant from the pool hall to the NIS office and another NIS agent who took the appellant's fingerprints at the NIS office. Neither could recall detecting the odor of alcohol about the appellant or otherwise corroborate the appellant's claim of intoxication. Thereafter, the military judge entered his special findings and ruled adversely to the appellant. In sum, the military judge concluded the mention of 20 years confinement did not constitute a threat, that the time and circumstances of the appellant's smoke break in the courtyard were not an attempt on NIS's part to coerce a statement through some sort of physical deprivation, and that the fabrication concerning Foggy's informing on the appellant was a permissible procedure. The military judge

also found the appellant did not inform Special Agent Weimer he was intoxicated and there was no reason for Special Agent Weimer to suspect it. The military judge allowed that the appellant likely had consumed alcoholic beverages that day, however, based on the facts, the military judge was not convinced the appellant was so intoxicated that he was unable to think clearly.

Inasmuch as the appellant's case comes to us for review under Article 66(c), UCMJ, 10 U.S.C. § 866(c), we are not bound by the military judge's essential findings. *United States v. Cole*, 31 M.J. 270 (C.M.A.1990); *United States v. Ruhling*, 28 M.J. 586, 592 n. 8 (N.M.C.M.R.1988), *pet. denied*, 29 M.J. 289 (C.M.A.1989). Nonetheless, we are generally inclined to give them deference. *United States v. Cummings*, 21 M.J. 987, 989 (N.M.C.M.R.), *pet. denied*, 22 M.J. 242 (C.M.A.1986); *United States v. Bright*, 20 M.J. 661, 664 (N.M.C.M.R.), *pet. denied*, 21 M.J. 103 (C.M.A.1985). In this case, we expressly concur in the military judge's essential findings as to those disputed matters of fact. Thus, as between the two versions of the facts, we find the special agent's more credible. In doing so, we reject the appellant's assertion that he was intoxicated, that the special agent physically abused him, and that the appellant was told if he did not confess he would receive 20 years. We also reject the suggestion that any brief involuntary detention in the courtyard at the end of appellant's smoke break induced him to make a statement. We accept that the agent accurately informed the appellant of the maximum authorized punishment for the offense he was then suspected of having committed and that the agent lied to the appellant about another sailor's "ratting" on the appellant in order to prod him to make a statement. We will also assume, *arguendo*, the appellant had consumed alcohol prior to his interrogation. It remains for us to determine, then, whether these circumstances, in light of all the circumstances, rendered the appellant's subsequent statement involuntary.

■ The constitutional test for the voluntariness of an accused's confession is:

Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of the confession offends due process.

*Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961). "[T]he question whether a particular criminal defendant's will has been overborne and broken is one ... that must be decided on the peculiar, individual set of facts of his case." *United States v. O'Such,* 16 U.S.C.M.A. 537, 543, 37 C.M.R. 157, 163 (1967) (quoting *Culombe*). In determining whether an accused's will has been overborne in a particular case, courts assess "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Some factors to be taken into account include the age of the accused, his education, his intelligence, the advice to the accused of his constitutional rights, the length of the detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. *Id.* The determination of voluntariness seldom turns on one factor. *Bustamonte,* 412 U.S. at 226, 93 S.Ct. at 2047; *United States v. Ballard,* 586 F.2d 1060, 1063 (5th Cir.1978). The import of the factors will vary according to the circumstances and the state of mind of the accused. *Ballard,* 586 F.2d at 1063. While the constituent elements of the interrogation leading to the confession may be reviewed separately, the circumstances should be evaluated together in determining whether the confession was voluntarily made. *Miller v. Fenton,* 796 F.2d 598, 605 (3rd Cir.), *cert. denied,* 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986). Therefore, we will evaluate the constituent elements raised by the appellant—consumption of alcohol, a statement of the authorized punishment and trick-ery—and then consider them in the totality of all the circumstances surrounding the taking of his statement.

### 1. The Effect of Prior Consumption of Alcohol.

■ The sole concern of the Fifth Amendment is governmental overreaching. *Colorado v. Connelly,* 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986). Absent police conduct causally related to the confession, there is no basis for concluding a confession was involuntarily induced within the meaning of the Fifth Amendment, and even where there is a causal connection between the actions of government agents and an accused's confession, it does not automatically follow that the confession was involuntary. *Connelly,* 479 U.S. at 164 & n. 2, 107 S.Ct. at 520 & n. 2 (citing *Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 1425, 22 L.Ed.2d 684 (1969)). "[W]hile mental condition is surely relevant to an individual's susceptibility to police coercion, mere examination of the confessant's state of mind can never conclude the due process inquiry." *Connelly,* 479 U.S. at 165, 107 S.Ct. at 520–21.

■ Generally speaking, "a confession is not inadmissible because the accused was intoxicated, unless he was virtually unconscious." 4 *Wharton's Criminal Evidence,* § 645 (C. Torcia 14th ed. 1985). If an accused is under the influence of alcohol at the time of the custodial interview, his statement would still be "voluntary" in the constitutional sense, unless the government exploited his condition with coercive tactics. *Cf. Connelly,* 479 U.S. at 164–65, 167, 107 S.Ct. at 520–21, 522; *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Blackburn v. Alabama,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960); *United States v. Thornton,* 22 M.J. 574 (A.C.M.R.), *pet. denied,* 23 M.J. 179 (C.M.A.1986); Annot., *Sufficiency of Showing that Voluntariness of Confession or Admission was Affected by Alcohol or Other Drugs,* 25 A.L.R. 4th 419 (1983). If an accused is under the influence of alcohol at the time he makes the statement and if the government agent soliciting the state-

ment is aware of it, then the accused's condition is a factor in determining whether other actions of the Government were so coercive or manipulative that they deprived the appellant of his ability to make an unconstrained, autonomous decision to confess. *See Miller,* 796 F.2d at 605; *see also United States v. Dison,* 8 U.S.C.M.A. 616, 25 C.M.R. 120 (1958); *United States v. Bryson,* 10 C.M.R. 164 (A.B.R.1953); *United States v. Pugh,* 9 C.M.R. 536 (A.B.R. 1953). Otherwise, the accused's condition is merely a matter that goes to the weight of his statements when those statements are considered by the finder of fact on the issue of the accused's guilt or innocence. *Connelly,* 479 U.S. at 159, 167, 107 S.Ct. at 517–18, 522; Mil.R.Evid. 601.

### 2. The Effect of Trickery.

 Ploys to mislead a suspect or lull him into a false sense of security do not render a statement involuntary provided they do not rise to the level of compulsion or coercion.[5] *Illinois v. Perkins,* 496 U.S. 292, 110 S.Ct. 2394, 2397, 110 L.Ed.2d 243 (1990) (undercover policeman posing as an inmate was not required to give fellow inmate *Miranda* warnings before questioning inmate about his criminal activity). "These ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." *Miller,* 796 F.2d at 605.

 A lie told to a detainee about an important aspect of the case is a factor to be considered in the context of all the circumstances of the interrogation. *Id.* at 607 (interrogator's lie to accused that victim died during the course of the interrogation

did not render an otherwise voluntary confession involuntary). A misrepresentation by police that a cohort has confessed or that a companion has identified the accused as a perpetrator, while relevant to a determination of voluntariness, would not render an otherwise voluntary statement involuntary. *Frazier,* 394 U.S. at 739, 89 S.Ct. at 1425; *United States v. Bostic,* 35 C.M.R. 511 (A.B.R.1964), *pet. for reconsideration of denial of review denied,* 15 U.S.C.M.A. 409, 35 C.M.R. 381 (1965); *United States v. Velasquez,* 885 F.2d 1076, 1087–89 (3rd Cir. 1989), *cert. denied,* 494 U.S. 1017, 110 S.Ct. 1321, 108 L.Ed.2d 497 (1990).

### 3. The Effect of Statements Respecting Punishment.

 Threats to prosecute or hold an accused in custody unless a statement is made are improper and will render a statement inadmissible. *United States v. Barksdale,* 17 U.S.C.M.A. 500, 502, 38 C.M.R. 298, 300 (1968); *United States v. Colton,* 5 C.M.R. 349 (N.B.R.1952); Mil. R.Evid. 304(c)(2) analysis. However, as to the impact of providing the accused requested information concerning the maximum authorized punishment, it has been observed:

> A truthful and non-coercive statement of the possible penalties which an accused faces may be given to the accused without overbearing one's free will. Such an account may increase the chance that one detained will make a statement. However, as long as the statement results from an informed and intelligent appraisal of the risks involved, rather than a coercive atmosphere, the statement may be considered to have been voluntarily made.

5. For many years military courts recognized that "use of deception in obtaining a confession is not impermissible as long as the artifice was not designed or calculated likely to produce an untrue confession." *United States v. McKay,* 9 U.S.C.M.A. 527, 531, 26 C.M.R. 307, 311 (1958). However, involuntary confessions, that is confessions which are the product of either physical or psychological coercion, are inadmissible not solely because they are likely to be untrue, but also because their extraction violates constitutional principles. *Rogers v. Richmond,* 365 U.S.

534, 540–41, 81 S.Ct. 735, 739–40, 5 L.Ed.2d 760 (1961): *United States v. Gibson,* 3 U.S.C.M.A. 746, 14 C.M.R. 164 (1954) (Quinn, C.J.). Therefore, deception must now be considered as a factor in determining whether the confession was a product of government overreaching which overbore the accused's will. Thus, the question of voluntariness goes beyond whether the deception would have produced an untrue confession. *O'Such,* 16 U.S.C.M.A. at 543, 37 C.M.R. at 163.

*United States v. Murphy*, 18 M.J. 220, 226 (C.M.A.1984) (quoting *Ballard*, 586 F.2d at 1063); *see also United States v. Bye*, 919 F.2d 6 (2d Cir.1990) (mere mention of the sentence facing defendant and benefits of cooperation did not render statement involuntary); *United States v. Paden*, 908 F.2d 1229 (5th Cir.1990) (encouraging the defendant to tell the truth and a recitation of the potential sentence did not render an arson confession involuntary).

 In sum, we have a custodial interrogation of a relatively brief duration, preceded by an advisement and waiver of rights, punctuated by two smoke breaks. The appellant is young, but obviously able to speak, read and write intelligently. The environment of the interrogation was neither coercive nor overbearing. If the appellant had consumed alcohol, it was not known or exploited by Special Agent Weimer. The truthful statement of the maximum authorized punishment of the offense about which the appellant was then being interrogated and the false statement that Foggy had "ratted" on the appellant may have increased the chance that the appellant would make a statement; however, these factors did not deprive the appellant of his ability to make an informed and intelligent appraisal of the risks involved or of his ability to make an unconstrained, autonomous decision to speak. Taken with all the circumstances of the interrogation in this case, these factors, individually and cumulatively, did not render the appellant's involuntary.[6]

### 4. Other Considerations.

 We recognize that admissions, as distinguished from confessions,[7] are subject to the same protection afforded confessions. Mil.R.Evid. 304(a), (c)(1), (c)(2). Involuntary admissions, produced in custody as a result of police coercion, are as equally susceptible to suppression as confessions are. *Miranda*, 384 U.S. at 476–77, 86 S.Ct. at 1629; *United States v. Murphy*, 18 M.J. 220, 224 n. 8 (citing *Bram v. United States*, 168 U.S. 532, 541, 18 S.Ct. 183, 186, 42 L.Ed. 568 (1898)). We

---

6. From Special Agent Weimer's testimony it appears the acknowledgement and waiver of rights were accomplished before the statements and actions giving rise to the claim of a coerced confession occurred. The appellant also does not appear to attack the statement's admission on grounds the warnings were inadequate or their waiver was coerced. Rather, the appellant focuses on the issue of voluntariness in the making of the statement, itself. We take the issue as presented at trial, that is, whether the statement was rendered involuntary because of the alleged intoxication, threats and trickery— not because the appellant was coerced or tricked into waiving his rights. We do take note of the fact, however, the appellant testified at least one of the acts of claimed coercion occurred throughout the interrogation. We also note there has been discussion as to whether the voluntariness inquiry is one inquiry or two, each having separate standards: The first concerns the waiver of rights, the second the voluntariness of the statement, itself. *E.g.*, *Velasquez*, 885 F.2d at 1088. For example, it has been suggested trickery may be employed with respect to the latter, but not the former. *United States v. Erie*, 29 M.J. 1008, 1012 (A.C.M.R. 1990). We believe the notion that there are two inquiries, each having separate standards, has resulted from an overly broad reading of *Miranda's* general propositions concerning deception. *Miranda*, 384 U.S. at 476, 86 S.Ct. at 1629; *see Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1140–41, 89 L.Ed.2d 410 (1986) (not telling a suspect his attorney is attempting to contact him is not the kind of "trickery" condemned by *Miranda*). In sum, we believe there is one and only one voluntariness inquiry with one standard, and the nature and timing of any statements by authorities to the accused are factors to be considered in the totality of the circumstances. *Cf. Perkins; Burbine*, 475 U.S. at 423, 106 S.Ct. at 1142; *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (unwarned admission did not render subsequent, warned confession inadmissible); *New York v. Quarles*, 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (public safety exception to *Miranda's* advisement requirements): *Oregon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (*Miranda's* advisement requirements inapplicable to non-custodial interrogation at police station; misrepresentations by police were relevant to other issues); *United States v. Steward*, 31 M.J. 259 (C.M.A.1990) (pre-advisement statement to Air Force officer that he should cooperate in drug investigation or risk losing his wings forever and statement that the results of the interview would be reported did not render admission involuntary).

7. A "confession" is an acknowledgement of guilt, whereas an "admission" is a self-incriminating statement falling short of an acknowledgement of guilt even if it was intended by its maker to be exculpatory. Mil.R.Evid. 304(c)(1), (2).

also believe, however, the nature of the matters stated by an accused should be a clue as to whether the accused's will was overborne by official action. *See United States v. Copeland*, 21 C.M.R. 838, 864 (A.F.B.R.1956).

The end product of Special Agent Weimer's interrogation was less than a complete confession. The statement made by the appellant was facially exculpatory. The appellant admitted that he had been in the barracks when the fire was set, that he had spilled cigarette lighter fluid, that he intended to clean it up, but that before he could do so, SR Foggy set fire to it. He also admitted he got scared and disposed of the bottle of lighter fluid. These admissions confirmed the appellant's presence at the scene and confirmed he had a role in the setting of the fire. His attempts to portray the spill as an accident and blame the fire exclusively on Foggy were contradicted by the testimony of an eye witness. These statements, once contradicted, might have been considered as evidence of the appellant's consciousness of guilt. *United States v. Hurt*, 9 U.S.C.M.A. 735, 778, 27 C.M.R. 3, 46 (1958) (quoting *United States v. Smolin*, 182 F.2d 782, 786 (2d Cir.1950). His discarding of the lighter fluid is also potentially incriminating inasmuch as guilt may be inferred from the destruction or concealment of tangible objects. 1 *Wharton's Criminal Evidence* § 86 (C. Torcia 14th ed. 1985). However, at the time the appellant made the statement, which is the relevant time frame for purposes of the voluntariness inquiry, these statements demonstrated the appellant retained the wherewithal to shift for himself. Thus, the facially exculpatory statement made by him is another factor confirming that the appellant's statement was otherwise voluntarily made.

### 5. Harmless Error.

Assuming, *arguendo*, the appellant's statement was involuntarily made and erroneously admitted, we need not reverse the trial court's findings of guilty if we are convinced the error was harmless beyond a reasonable doubt. *Arizona v.*

*Fulminante*, —— U.S. ——, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (plurality opinion); *cf. Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). We believe the "harmless error" analysis is particularly appropriate when the statement is more in the nature of an admission than a full confession. Therefore, putting the appellant's statement aside, the remaining evidence can be fairly summarized as follows:

A witness (Seaman Apprentice Hilton) and the appellant returned to their barracks, Building 588, Wing E–1, Naval Training Center, San Diego, California, on the evening of 12 February 1990 after a brief trip off base to purchase and consume a bottle of ale. Upon return, another barracks mate, SR Foggy, appeared. The appellant produced a yellow bottle of lighter fluid and was observed squirting the lighter fluid in a figure eight pattern on the barracks floor. SR Foggy said to the appellant, "Put it around his bed." There was then an explosion. The alleged victim of the assault (Seaman Scheidt) awakened to find his bed in cubicle 9 on fire. SR Foggy asked him if he was smoking in bed. The appellant was standing nearby. SA Hilton saw the appellant run and jump into his bed with his clothes on. The barracks was evacuated and the fire was extinguished. In the courtyard outside of the barracks, the appellant was heard by a witness (Seaman Thompson) arguing with another male and was overheard to remark, "If I go to the brig, I still get a paycheck on the 1st and the 15th." The following day, the same witness who had overheard this comment by the appellant again encountered the appellant in the courtyard. The master-at-arms had picked up SR Foggy, and the appellant asked the witness to walk around the barracks with him. The appellant led the witness up to some bushes and pointed out the back of a yellow bottle and said, "That's what we did with it." The appellant asked the witness to stay there to watch it while the appellant went into the barracks to get his raincoat. The appellant was going to take the bottle off

base because it was the only evidence they had. This witness, rather than becoming an accessory after the fact, immediately reported the occurrence and the bottle of lighter fluid was recovered outside of the window to cubicle 9.

We find the evidence, with *or* without the appellant's admission, establishes the appellant's guilt beyond a reasonable doubt. If the appellant's statement was erroneously admitted because it was involuntarily made, we conclude such an error was harmless beyond a reasonable doubt.

### Trial In Absentia.

An accused is required to be present for every stage of his court-martial. R.C.M. 804(a). The accused is deemed to have waived his right to be present at the trial and the trial may proceed in his absence if the accused was initially present at trial and voluntarily absented himself after arraignment. R.C.M. 804(b). After arraignment of the appellant and after the trial court conducted the pretrial evidentiary hearing discussed above, the trial counsel informed the military judge that it was likely the appellant would be released from pretrial confinement. At trial counsel's request, the following colloquy occurred:

> MILITARY JUDGE: [I]f you should not be around when we do eventually get to try this case, which the Government anticipates will be some time next week or the week after, and if you're not around because you've gone UA, for example, and are voluntarily not present, then we could try this case without you, without you even being here. Your lawyer would have to carry on without you, but the defense can be compelled to go forward in your absence, so what I'm trying to get at is it is certainly in your best interests to ensure that you are around for the day of trial when it does arise. Do you understand that?
> ACCUSED: Yes, sir.

Record at 87. The military judge then inquired of the trial counsel whether the Government had "anything like a half-way confirmed trial date." *Id.* Trial counsel responded by stating a priority naval message had been sent to locate a witness and

the Government did not know when it could proceed until it received a response to the message. The military judge continued the case "until the Government indicates it is ready to go to trial." *Id.* The court adjourned on 25 May 1990. The court was next called to order on 7 June 1990. The appellant was not present.

At the 7 June Article 39(a) session, the Government introduced evidence on the issue of the voluntariness of the appellant's absence from trial. The Government called Petty Officer Lizo, a master-at-arms and company commander at the Disciplinary Barracks, Service School Command, San Diego, California. Petty Officer Lizo had been tasked to coordinate the locating of the appellant. In substance he testified that he had contacted base police and master-at-arms, the San Diego Police Department and the local naval hospital with negative results. Various barracks were searched also with negative results. Petty Officer Lizo further explained that at approximately 0935, Friday, 1 June 1990 (a payday), the appellant returned from an unauthorized absence. The appellant provided a specimen for a urinalysis, but failed to report for a 1615 muster. Since then, the appellant had not appeared. The Government also called Chief Faas, Naval Legal Service Office, San Diego. She was the trial administrative and court reporter supervisor. On 6 June 1990, she unsuccessfully attempted to contact the appellant at his home of record in Austin, Texas. She also called the Austin Police Department. They checked their computer and had no record of the appellant's being in jail there. Similar negative results were achieved when Chief Faas contacted the San Diego Sheriff's Department. Thereafter, the military judge stated that in an R.C.M. 802 conference with counsel on 1 June 1990, the appellant's case was set for trial that day, 7 June 1990. Trial defense counsel concurred that at the R.C.M. 802 conference "a specific date was chosen which the Government stated they were ready to proceed on that date." Record at 97. Trial defense counsel urged the court not to proceed because the appellant had

not been given a specific date for his trial. Contrarily, trial counsel urged the court to proceed because he had four witnesses standing by from the East Coast and one witness from Gaeta, Italy, and because the 25 May admonition to the appellant was sufficiently specific. The military judge overruled trial defense counsel's objection to proceeding, finding by a preponderance of the evidence the appellant "knew that he had an imminent trial date in the next week or two following the 25th of May, and that his failure to be present today is based on his desire not to be present...." Record at 107. Nonetheless, at trial defense counsel's request, the appellant's case was continued until 13 June 1990. On that date the appellant was again absent. The appellant's trial was completed the same day. Sometime after his trial, but before 29 August 1990, the appellant returned to military control. Staff Judge Advocate's Recommendation (29 August 1990). The appellant, who does not now suggest that he was involuntarily absent from his court-martial, asserts that the court's ruling was erroneous for the same reasons stated at trial, viz., no specific trial date had been set for his trial.

█ Unquestionably, Article 39(a) pre-trial sessions were authorized to avoid the kind of problem now before us. When the Government or the accused is unable to set a trial date, the correct practice is to schedule Article 39(a) sessions at dates, times and places certain at which the military judge can ascertain on the record in the presence of the accused the progress toward setting a trial date. For each successive session the accused should be informed on the record of the date, time and place of the next session, and the court should adhere to it. Having said as much, such action was not taken in this case, and it remains for us to determine whether the military judge's findings were correct and whether he abused his discretion in proceeding in the absence of proof the appellant was informed of anything more than his trial would proceed within a week or two.

█ As stated above, an accused's voluntary absence from trial after arraignment does not prevent the trial from proceeding *in absentia.* *United States v. Houghtaling,* 2 U.S.C.M.A. 230, 8 C.M.R. 30 (1953) (accused escaped from confinement after arraignment and notification of trial date and remained at large). The lack of a warning to the accused his trial could continue in his absence does not preclude a finding the accused's absence from trial was voluntary. *United States v. Bystrzycki,* 8 M.J. 540 (N.C.M.R.1979). Absence alone warrants a finding of voluntariness when the accused has been given notice of the date of trial and there are no circumstances indicating to the contrary. *United States v. Peebles,* 3 M.J. 177, 179 (C.M.A.1977) (absence was not presumed voluntary where there was an eight-month's hiatus between court sessions, the appellant was residing at home and the appellant had not been informed of date for trial); *cf. United States v. Cook,* 20 U.S.C.M.A. 504, 43 C.M.R. 344 (1971) (voluntariness of absence would not be presumed in face of evidence of mental illness). It has been suggested that *Peebles* requires the accused to be notified of the *exact* date of trial, however, such a strict reading of *Peebles* has been questioned. *United States v. Yarn,* 32 M.J. 736, 738 (A.C.M.R.1991) (accused waived presence at trial when he knew of original trial date and absented himself, but did not know subsequent date to which his trial had been continued). We have previously held the accused must be informed the trial will definitely proceed to completion at some future date, and the record must show the accused knew or had reason to know the trial would continue. *United States v. Brown,* 12 M.J. 728 (N.M.C.M.R.1981) (accused did not have adequate notice of trial after military judge rejected accused's improvident guilty plea, ordered a sanity board, and continued trial without any indication as to when it would reconvene). More recently, we stated:

> While we stop short of establishing as an absolute rule that proof that an accused has been advised of the date to which a trial is continued is indispensable to a finding of voluntariness in every conceiv-

able case, it can scarcely be doubted that such is a very highly relevant circumstance....

*United States v. Sanders*, 31 M.J. 834, 840 (N.M.C.M.R.1990).

 The point of the notice requirement is, of course, that it is not proper to infer that absence from trial is voluntary if the accused did not know when his trial was to be held. The inference of voluntariness is a tool of the trial court. Its value to a Court of Review is its bearing on the issue of whether the trial court abused its discretion. Unless an appellant remains absent at the time his case is reviewed, it otherwise loses its pertinence since the appellant can account for his absence. Moreover, the inference of voluntariness is easier to draw when the accused is an active duty member of the armed forces and his absence from military control is unauthorized. Thus, we are of the view that notice of the exact date of trial and warning of the consequences of absence are highly desirable steps to be taken, but they are factors, not prerequisites, in determining whether an accused has absented himself from trial voluntarily.

 The accused's presence at trial is both a right and a requirement. His presence is a matter of procedure, not an element of proof. By authorizing trial *in absentia* after arraignment, the military accused is ordinarily under sufficient notice that court-martial proceedings are pending against him, that they will be carried out within the near future, and that it is in his interest to remain within military control, as he is otherwise under a statutory obligation to do. Here, the trial court warned the appellant of the consequences of his absence from trial. It informed him the trial would continue within the near future. The trial continued within the near future. The appellant absented himself from the military without authority, and the Government made a reasonably diligent effort to learn his whereabouts. The appellant does not offer any explanation for his absence. While the practice employed here is not a model to emulate, it provided the appellant with a sufficiently specific trial date. Accordingly, we concur in the findings of the military judge that the appellant was voluntarily absent from trial, and we conclude the military judge did not abuse his discretion in proceeding in the absence of the appellant.[8]

The balance of the assignments of error do not merit discussion. The claim of ineffective assistance of trial defense counsel is frivolous. The findings and sentence as approved on review below are affirmed. We note, however, the military judge's sentence to total forfeitures was for a period

8. The appellant also claims the parties erred by stipulating to the substance of an R.C.M. 802 conference in the absence of the appellant. Whether or not a stipulation is accepted by the military judge without the accused's personal assent is a matter within the military judge's discretion. *United States v. Cambridge*, 3 U.S.C.M.A. 377, 383, 12 C.M.R. 133, 139 (1953); see R.C.M. 811(c) discussion. In *United States v. Williams*, 30 C.M.R. 650 (N.B.R.1960), we held that receipt of a stipulation in an *in absentia* trial was an abuse of discretion. We need not reconsider that holding. At the time of the appellant's trial *802* conferences could not be held over the objection of a party. (That limitation was abolished on 6 July 1991. Exec. Order No. 12,767, 56 Fed.Reg. 30, 292, 30, 299 (1991).) No objection has been noted in the record to the 1 June *802* conference. R.C.M. 802 conferences need not be made a part of the record, however, matters agreed upon at a conference should be made a part of the record orally or in writing. R.C.M. 802(b). Admissions made by an accused or his counsel at an 802 conference cannot be used against an accused unless they are reduced to writing and signed by the accused and counsel. R.C.M. 802(e). The custom is, of course, for the military judge to state for the record the substance of the *802* conference and then afford counsel the opportunity to concur, dispute, amend, or embellish. This function has never required the formal concurrence of the accused, unless an admission is involved. The 802 conference is available to resolve essentially procedural matters. R.C.M. 802(a) and discussion. As long as the matters recited from the *802* conference are confined to their proper scope, we believe the practice is proper whether or not the appellant is present at the *802* conference or trial. *See also* Mil.R.Evid. 104(a). Here, unlike *Sanders*, no admissions were exacted, and the military judge did no more than state for the record the status of his own docket of which he could have taken notice in any case. Finally, the matters recited by the military judge and concurred by counsel have no bearing on the resolution of the appeal.

of 10 months[9] and the court-martial order eliminated the time limitation on total forfeitures. *United States v. Tuttle*, 32 C.M.R. 686 (N.B.R.1962). Accordingly, a corrected court-martial order shall be issued.

Senior Judge STRICKLAND and Judge ORR concur.

---

**9.** Customarily total forfeitures are not awarded for a period of time. R.C.M. 1003(b)(2).