**UNITED STATES, Appellant,**

v.

**Cliff T. LINCOLN, 585–06–4007 Fire Controlman Second Class (E–5) U.S. Navy, Appellee.**

**NMCM No. 9400425.**

U.S. Navy–Marine Corps Court of Military Review.

28 July 1994.

Maj Steven P. Hammond, USMC, Appellate Defense Counsel.

LT D. Jacques Smith, JAGC, USNR, Appellate Defense Counsel.

Maj Laura L. Scudder, USMC, Appellate Government Counsel.

MOLLISON, Senior Judge:

The single issue in this interlocutory appeal by the Government is whether the military judge erred in suppressing the accused's pretrial confession. We conclude that he did. Accordingly, we reverse the military judge's ruling suppressing appellee's pretrial confession (Appellate Exhibit XI), order the appellee's pretrial confession to be admitted subject to corroboration (Mil.R.Evid. 304(g)(2)), and return the record for a trial on the merits.

On 17 September 1993, the appellee, a 26-year old Fire Controlman Second Class, gave a sworn, written statement (Appellate Exhibit XI), to Special Agent Robert Dortch of the Naval Criminal Investigative Service (NCIS). In his statement, the appellee admitted that in December of 1992, in a motel in Reno, Nevada, he sexually molested his 3–year old daughter by rubbing his erect penis on her bare buttocks until he ejaculated. On 8 December 1993, the appellee was charged with committing an indecent act upon a child in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934 (1988), and the same day the charge was referred to trial by special court-martial. UCMJ arts. 19, 23, 10 U.S.C. §§ 819, 823 (1988). In a pretrial session of court conducted pursuant to Article 39(a), UCMJ, 10 U.S.C. § 839(a) (1988), the appellee moved to suppress his pretrial confession on grounds it was involuntary. Rule for Courts–Martial

(R.C.M.) 905(b)(3), Manual for Courts–Martial, United States, 1984; Mil.R.Evid. 304; Appellate Exhibit IV. More specifically, the appellee asserted that his confession was the product of Government coercion, that his invocation of his right to counsel had not been honored, that there was a failure to give notice of interrogation to defense counsel, and that the appellee had been the recipient of pretrial ineffective assistance of defense counsel. The military judge granted the appellee's motion to suppress. Inasmuch as the ruling excluded evidence that was substantial proof of a material fact in the proceeding, the Government elected to appeal to this Court pursuant to Article 62, UCMJ, 10 U.S.C. § 862 (1988).

### Standard of Review

In ruling on an appeal under Article 62, a Court of Military Review may act only with respect to matters of law, and it is bound by the military judge's findings of fact unless they are unsupported by the evidence of record or are clearly erroneous. *United States v. Bolado*, 34 M.J. 732 (N.M.C.M.R. 1991), *aff'd*, 36 M.J. 2 (C.M.A.), *cert. denied*, — U.S. —, 113 S.Ct. 321, 121 L.Ed.2d 242 (1992); UCMJ art. 62(b), 10 U.S.C. § 862(b) (1988). The ultimate issue of the voluntariness of a confession is a question of law. *See United States v. Martinez*, 38 M.J. 82 (C.M.A.1993).

### Material Facts

In July of 1993, NCIS Special Agent Carol Cacciaroni received a report from the U.S. Air Force Office of Special Investigations in New Mexico that the appellee's daughter had made allegations of sexual molestation against him. On the morning of 10 September 1993, SA Cacciaroni left a telephonic message for the appellee at his command. When the appellee returned the call, SA Cacciaroni told him that she needed to see him at 1300 at her office at NCIS Headquarters, Mare Island, California. The appellee advised that he had plans in the afternoon and they arranged to meet at 1230.

Upon appellee's arrival, SA Cacciaroni advised him verbally and in writing of the constitutional and statutory rights provided in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *United States v. Tempia*, 16 C.M.A. 629, 37 C.M.R. 249 (1967) (applying *Miranda* to military interrogations), and Article 31(b), UCMJ, 10 U.S.C. § 831(b) (1988). Specifically, the appellee was advised that he was suspected of "child sex abuse;" that he had the right to remain silent; that any statement could be used against him in a trial by court-martial or other judicial or administrative proceeding; that he had a right to consult with a lawyer prior to questioning; that this lawyer may be a civilian lawyer retained by him or a military lawyer appointed to act as his counsel at no cost to him, or both; that he had the right to have retained or appointed counsel present during the interview; and, that he could terminate the interview at any time, for any reason. Appellate Exhibit XII. The appellee waived his rights and agreed to be interviewed by SA Cacciaroni without the assistance of counsel.

In the ensuing interview the appellee denied molesting his daughter and surmised his ex-wife was trying to ruin him and was planting the allegations of child molestation in his daughter's head. SA Cacciaroni asked the appellee whether he would be willing to provide a voluntary, sworn statement. Appellee initially agreed. She also asked him whether he would be willing to take a polygraph examination. The appellee responded by saying that he wished to give that matter some thought. Then, when SA Cacciaroni started to prepare the written statement, the appellee also stated that he wanted to think about that matter, as well. SA Cacciaroni said, "No problems, it's voluntary. If you don't want to give it, you don't have to give it." Record at 20. SA Cacciaroni then gave the appellee her business card and told him to get back to her with his decision as to the statement and polygraph. The interview terminated and the appellee left the NCIS office.

On 14 September, SA Cacciaroni telephoned the appellee at his command and asked him if he had made a decision. The appellee responded by saying that he had made an appointment at the Naval Legal Service Office to speak with a lawyer. SA

Cacciaroni said, "Okay, just let me know what your decision is." The appellee responded by saying, "Fine." Record at 21.

On 15 September, the appellee telephoned SA Cacciaroni. He informed her that he had spoken with a lawyer, named Lieutenant Kelly; that they did not have an attorney-client relationship; that if LT Kelly were assigned as appellee's defense counsel, he would tell the appellee not to take the polygraph; but, that LT Kelly further advised the appellee that "if he didn't do anything wrong, to just go ahead and talk to them and take the polygraph." Record at 22, 43–44, 50. SA Cacciaroni then stated, "If you don't want to give [a statement], you don't have to give it. It's voluntary, but I need to know—you know, as far as the statement and the polygraphy, but I need to know." Record at 44. The appellee replied that he was confused; that he wanted to talk to Don Foster, a marriage and child counsellor at the Family Service Center; and, that he would call SA Cacciaroni back once he spoke with Mr. Foster. Record at 22, 44, 49–50. SA Cacciaroni responded by saying, "That's fine, just give me a call back." Record at 22.

At 1710, 16 September, the appellee telephoned SA Cacciaroni and informed her that he would go ahead, provide a statement, and take a polygraph examination. She in turn informed the appellee that she would make arrangements for the polygraph and get in touch with him.

The morning of 17 September, SA Cacciaroni telephoned the appellee and told him that she needed to speak with him again and for him to come to her office. The appellee said he would. The appellee arrived at the office and at 1000 met with the NCIS polygrapher, SA Robert Dortch. SA Dortch escorted the appellee to the polygraph examination room. He then explained the polygraph procedures. Utilizing two forms, he advised the appellee verbally and in writing of his rights, as provided by *Miranda*, *Tempia*, and Article 31(b), and his right to refuse to take a polygraph examination. Since SA Dortch had information that the appellee had spoken with a lawyer, he specifically inquired of the

appellee whether he had any problem talking with the agent without an attorney present. The appellee advised SA Dortch that he did not. The appellee also advised SA Dortch that he did not have any questions about the examination "insofar as needing to talk to counsel." Record at 58. The appellee verbally and in writing waived the assistance of counsel and agreed to the interview and polygraph examination.

Next SA Dortch embarked on the "pretest" portion of the polygraph procedure. He collected from the appellee background information and "control information" for the actual administration of the examination. Next, SA Dortch explained to the appellee the instrumentation and how the examination detects deception. Then, SA Dortch discussed the allegations and formulated with the appellee the questions and answers upon which the examination would be conducted.[1] The appellee appeared to be cooperative, coherent, articulate, and attentive. At the conclusion of the pre-test procedure, the appellee took a break of 10–15 minutes duration, during which he visited the head, smoked a cigarette, and drank a cup of coffee.

When the appellee returned to the examination room, the "in-test" portion of the examination was conducted. During this portion of the examination, SA Dortch and the appellee reviewed the formulated questions and answers. SA Dortch then attached the apparatus to the appellee, conducted an "acquaintance test," and then conducted the polygraph examination itself, utilizing the previously agreed questions and answers. The agreed questions were asked of the appellee three times. This procedure required 11 minutes. Following the administration of the examination, the apparatus was disconnected from the appellee, SA Dortch evaluated the charts, and the parties embarked upon the "post-test" or the discussion/interrogation phase.

The "post-test" portion of the procedure commenced at 1210. After reviewing the charts, SA Dortch confronted the appellee, advising him that he believed the appellee

1. The relevant questions concerned the allegations of child molestation. The responses upon which the appellee was to be tested were negative to those questions.

was untruthful when responding to the questions and was culpable concerning the molestation of his daughter. The two conversed for 20–25 minutes. There were "a couple of denials" by the appellee. SA Dortch informed the appellee he did not believe those denials. SA Dortch further relates: "As we got farther into it, I then asked him to explain to me exactly what did occur, at which time [1235] he advised me that he did, in fact, molest his daughter while in [a motel] up in Reno, Nevada." Record at 66. The appellee was embarrassed and it was "very difficult" for the appellee to make the admissions, which were arrived at incrementally through questions put to the appellee by SA Dortch "each step of the way." Record at 67. At 1310, SA Dortch and the appellee then moved to another room where a typewriter was located. The appellee repeated the admissions, which were reduced to typewritten form and subscribed and sworn to by the appellee at 1356. The appellee appeared to be very remorseful and teary. Accordingly, SA Dortch contacted SA Cacciaroni to arrange some counselling. SA Dortch and the appellee parted company thusly: "Asked him how he felt; he said that he felt better, felt good now that it was over and that he had said something about it, and thanked me and shook my hand. And that's the last I saw of him." Record at 69.

SA Cacciaroni next saw the appellee at 1400. He was smoking a cigarette on the porch in front of the office. The appellee was upset and tearful. The appellee apologized to her for not being truthful with her and said he had to be honest with himself before he could be honest with anyone else. SA Cacciaroni then arranged for a counsellor at the Family Service Center to speak with the appellee and the appellee left the NCIS office.[2]

Finally, the record includes the sworn statement of LT K.M. Kelly, JAGC, USNR, in which he relates that he did not recall seeing the appellee in his capacity of "duty defense" attorney at Naval Legal Service Office, San Francisco. However, he also related the standard operating procedures. In essence, he advised that he would seek the authority of his superiors to establish an attorney-client relationship under circumstances such as these, but if he could not, he would nonetheless counsel against speaking with NCIS agents.

The appellee did not testify.

Following the taking of evidence, the military judge granted the defense motion to suppress the confession "under Article 31(b)." Record at 92. The military judge entered essential findings in support of his ruling. With some modifications, he adopted findings proposed by the appellee. Record at 94–95. Notwithstanding some difficulty, we believe we have been able faithfully to construct his essential findings from the record before us:

1. That on 10 September 1993, FC2 Lincoln was contacted by Special Agent Cacciaroni to inform FC2 Lincoln of the charges against him and to question him;

2. That on 10 September 1993, FC2 Lincoln reported to Special Agent Cacciaroni for that purpose;

3. That on 10 September 1993, FC2 Lincoln was a suspect within the meaning of Article 31(b) of the UCMJ; that the rights afforded under Article 31(b) were applicable to FC2 Lincoln and Special Agent Cacciaroni; and, that Special Agent Cacciaroni informed FC2 Lincoln of the charges against him and read him his Article 31(b) rights;

4. That on 10 September 1993, when Special Agent Cacciaroni asked FC2 Lincoln if he wanted to make a sworn statement and submit to a polygraph, FC2 Lincoln answered that he did not at this time and indicated that he wanted to think about it.

5. That on 14 September 1993, Special Agent Cacciaroni again contacted FC2 Lincoln. He informed her that he had an appointment to see a Navy attorney; that he did specifically not want to decide whether to submit a sworn statement or submit to a polygraph until he had consulted with a lawyer, that is, consulted *within the meaning of Article 31(b) of the UCMJ;*

---

**2.** Apparently, another individual had committed suicide following a polygraph examination, and SA Cacciaroni wanted to make certain the appellee was in a stable emotional state.

that Special Agent Cacciaroni fully understood the meaning of the accused's request; and, that Special Agent Cacciaroni had an obligation as a law enforcement agent of the United States to ensure compliance *with Article 31(b) of the UCMJ;*

6. That on 15 September 1993, FC2 Lincoln had a meeting with LT Kevin Kelly, JAGC, USNR, during which LT Kelly advised that he did not want to know the specifics of FC2 Lincoln's case and could not form an attorney-client relationship; and, that LT Kelly did not form an attorney-client relationship with the accused, and was not informed of any of the specific facts of this case prior to giving the advice contained in Appellate Exhibit number VIII, LT Kelly's statement;

7. That on 16 September 1993, FC2 Lincoln communicated with Special Agent Cacciaroni the events of his meeting with LT Kelly and specifically that LT Kelly could not form an attorney-client relationship with FC2 Lincoln and that FC2 Lincoln was still confused about his right to counsel; that FC2 Lincoln was also still unsure about submitting a statement or taking a polygraph; that that communication to Special Agent Cacciaroni was understood by her not to be in compliance with *the consultation portion of Article 31(b), consultation of a lawyer;* that she knew that that communication didn't comply with his right to consult with a lawyer; and, that Appellate Exhibit XIII, her case memorandum of 15 September 1993,[3] was in the record provided to Special Agent Dortch prior to the conducting of the polygraph examination, so that the fact of *noncompliance with Article 31(b) of the UCMJ* was clearly available to Special Agent Dortch;

8. That on 16 September 1993, FC2 Lincoln's *Article 31(b) rights were violated in that the NCIS Agent Cacciaroni was on* *clear notice that Lincoln did not want to deal with NCIS until [he] had consulted with an attorney;* that NCIS Agent Cacciaroni knew or should have known that Lincoln's right to counsel had not been afforded, therefore all contact and further interviews should have ceased [adopted by the military judge as a conclusion of law]; and, that the government has not met its burden of proving by a preponderance of the evidence that the statement was obtained in a manner which complied with Article 31(b), citing *United States v. Martinez,* 38 M.J. 82 (C.M.A.1993); and,

9. That any further questioning of FC2 Lincoln, subsequent to his notice to Special Agent Cacciaroni, that he chose to exercise his rights under Article 31(b), were in fact involuntary and are inadmissible under Mil.R.Evid. 305 [also denominated as a conclusion of law by the military judge].

Record at 94–95; Appellate Exhibit XVIII (emphasis added).

### Analysis

■ It is a legal axiom that involuntary pretrial confessions are inadmissible in trials by court-martial. The axiom is founded on the Constitution, statute, and executive order. *See generally United States v. Lonetree,* 35 M.J. 396 (C.M.A.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 1813, 123 L.Ed.2d 444 (1993); *United States v. O'Such,* 16 C.M.A. 537, 37 C.M.R. 157 (1967); *United States v. Monge,* 1 C.M.A. 95, 2 C.M.R. 1 (1952); UCMJ art. 31(d), 10 U.S.C. § 831(d) (1988); Mil.R.Evid. 304, 305. In order to ascertain the correctness of the military judge's ruling, we examine the trial court's decision under all three of these sources of military law.

#### 1. Article 31(b), UCMJ

■ The military judge's decision to suppress the appellee's pretrial confession ap-

---

**3.** The memorandum states the following:

9–15–93 *1520* recv'd call fr Lincoln Said he met w/L. Kelly, def. @ NLSO. who told him they didn't have an attorney client relationship and he did not want to hear specifics. Said if he was assigned as def counsel he would tell him not to take P.G. Then he said if you have nothing to worry about then take it.

s/ said he was confused and didn't know what to do. Said he has an appt w/ Don Foster @ family service and wants to talk to him before he makes a decision. Said he would call me tomorrow after his 1615 appointment.

pears to have been based on his conclusion that the appellee's confession was involuntary because his right to counsel *under Article 31(b) of the Code* had not been honored. Article 31(b) provides:

> No person subject to [the UCMJ] may interrogate, or request any statement from an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.

UCMJ art. 31(b), 10 U.S.C. § 831(b) (1988).

As is apparent, nothing in Article 31(b), or for that matter any of the sections of Article 31, creates a right to the assistance of counsel, much less mentions the assistance of counsel. In fact, our senior Court has observed:

> Article 31 of the Uniform Code of Military Justice, 10 U.S.C. § 831, established a warning requirement for military interrogations—whether custodial or noncustodial. However, the statutory warning does not include any reference to a suspect's right to counsel; and so far as the Code itself is concerned, servicemembers are granted no right to demand the presence of counsel if they are interrogated prior to the filing of charges.

*United States v. Harris,* 19 M.J. 331, 335 (C.M.A.1985); *see also* Mil.R.Evid. 305(d)(1) analysis.

Therefore, the military judge's reliance upon this provision of the Code for his conclusion that the appellee was deprived the assistance of counsel was in error. Additionally, there is no evidence in the record to support a finding that at any time in the course of these proceedings the actual requirements of Article 31(b) were not observed. The military judge made no finding of fact to that effect, and any such finding of fact would have been clearly erroneous. Before the appellee made any statement regarding the offense, he was fully advised of his Article 31(b) rights, viz, the nature of the accusation against him, that he did not have

to make a statement regarding the offense, and that any statement made by him may be used as evidence against him in a trial by court-martial. There is no question the appellee understood these rights and knowingly, consciously, and voluntarily waived them. In fact, he exercised his Article 31(b) rights at the conclusion of the first interview when he temporarily deferred giving a written statement, albeit exculpatory, on 10 September.

Having disposed of the military judge's legal basis for his ruling, we nonetheless feel obliged to continue with an analysis of the case on the possibility that the military judge's ruling is otherwise supportable.

### 2. Right to Counsel under the Fifth Amendment

The Fifth Amendment to the Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." In *Miranda,* the United States Supreme Court held that in order to ensure that an accused's Fifth Amendment right against compulsory self-incrimination is protected, an accused's pretrial statements made to police while in their custody would be inadmissible against the accused, unless the statement was preceded by advice to the accused that he had the right to remain silent and the right to the presence of counsel, retained or appointed, and the accused voluntarily, knowingly and intelligently waived those rights. 384 U.S. at 444–45, 86 S.Ct. at 1612. In *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court further held that when an accused has invoked his right to have counsel present during a custodial interrogation, the accused may not be subjected to further interrogation by the authorities until counsel is made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. It also held in *Edwards* that a waiver of the accused's previously invoked right to the presence of counsel cannot be shown only by the fact that the accused responded to further police-initiated custodial interrogation, even if he has been advised of his rights. 451 U.S. at 484–85, 101 S.Ct. at 1884–85. In *Minnick v. Mississippi,* 498

U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990), the Supreme Court clarified *Edwards,* holding that "when counsel is requested, interrogation must cease, and officials may not reinitiate interrogation without counsel present, whether or not the accused has consulted with his attorney." 498 U.S. at 153, 111 S.Ct. at 491. And most recently, in *Davis v. United States,* —— U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the Supreme Court further clarified *Edwards,* holding that "after a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney," and "[i]f the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." —— U.S. at ——, 114 S.Ct. at 2356. The Court also held that it is entirely proper for law enforcement officers to seek to clarify a suspect's ambiguous remarks respecting counsel, though they are not required to do so. —— U.S. at ——, 114 S.Ct. at 2357.

■ The Supreme Court has reserved judgment on the question whether the Fifth Amendment and the *Miranda/Edwards* line of cases apply to the military. *Davis,* —— U.S. at —— n. *, 114 S.Ct. at 2357 n. *. Nonetheless, the *Miranda/Edwards* constitutional limitations on the admissibility of pretrial statements have been applied to trials by court-martial by military appeals courts and the President under his rule-making authority. *E.g., United States v. McLaren,* 38 M.J. 112 (C.M.A.1993); *United States v. Applewhite,* 23 M.J. 196 (C.M.A.1987); *United States v. Goodson,* 22 M.J. 22 (C.M.A.1986); *Tempia; United States v. Jordan,* 35 M.J. 856 (N.M.C.M.R.1992), *aff'd,* 38 M.J. 346 (C.M.A.1993); UCMJ art. 36(a), 10 U.S.C. § 836(a); Mil.R.Evid. 304(a), (c). Therefore, we will continue to apply *Miranda, Edwards,* and their progeny.

■ *Miranda* and *Edwards* apply to custodial interrogations. Neither applies to non-custodial interviews. *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam); *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam); *United States v. Grooters,* 39 M.J. 269, 275–76

(C.M.A.1994) (Crawford, J., concurring); *see United States v. Schake,* 30 M.J. 314 (C.M.A. 1990). A "custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Beheler,* 463 U.S. at 1123, 103 S.Ct. at 3519 (quoting *Miranda,* 384 U.S. at 444, 86 S.Ct. at 1612).

> [A] noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is a part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*Mathiason,* 429 U.S. at 495, 97 S.Ct. at 714. On the question of whether one may be under custodial interrogation when summoned to an office for interrogation by military investigators, the United States Court of Military Appeals has observed:

> In the military, unlike civil life, a suspect may be required to report and submit to questioning quite without regard to warrants or other legal process. It ignores the realities of that situation to say that one ordered to appear for interrogation has not been significantly deprived of his freedom of action.

*Tempia,* 16 C.M.A. at 636, 37 C.M.R. at 256.

■ The issue is, then: Whether, if ever, was the appellee in a custodial interrogation?

"This is largely a question of fact, although the ultimate conclusion is a legal one." *Schake,* 30 M.J. at 318. The military judge made no essential findings on this issue; nonetheless, we believe the record is sufficiently complete on this point to draw proper legal conclusions. In resolving the issue, we must examine the totality of the circumstances, focussing on the state of mind of a reasonable Sailor in appellee's position. *Schake,* 30 M.J. at 318 (citing *United States v. Carter,* 884 F.2d 368, 370 (8th Cir.1989)).

■ The appellee was never placed under apprehension or under restriction. The initial contact with the appellee was by telephone. No military authority directed him to appear at the NCIS office. The appellee freely negotiated the time of the meeting with SA Cacciaroni. At the outset of the interview, the appellee was advised of all rights that could potentially apply. The fact that the agent prudentially included a counsel advisement did not transmogrify the interview from noncustodial to custodial. More importantly, the appellee was informed that he could terminate the interview at any time, for any reason. The appellee waived his rights, whether they were genuinely applicable or not, and spoke with the agent. Ultimately, the appellee concluded the interview and left the office unrestrained. Under the totality of the circumstances, and being mindful of *Tempia's* injunction respecting the realities of military life, we conclude that the interview did not constitute custodial interrogation within the meaning of *Miranda* as applied to military investigations.[4]

■ Assuming, *arguendo,* that this first meeting constituted a custodial interrogation, we observe that the appellee was advised of appropriate rights, waived them, and terminated the interview without invoking a right to counsel. Moreover, his inculpatory statement was not obtained until 7 days later. Therefore, the appellee's status as in-custody or not-in-custody at the 10 September meet-

ing with SA Cacciaroni is irrelevant inasmuch as the appellee did not invoke any right to counsel and did not confess. If anything, this meeting demonstrated to the appellee that he was perfectly free to come and go as he pleased vis-a-vis NCIS.

The balance of the scenario is set out in detail above and will not be restated. Suffice to say, it clearly reflects that the appellee was at no other time in custody. Accordingly, *Miranda, Edwards,* and *Minnick* did not apply, and the appellee was deprived of nothing to which he was entitled respecting the assistance of counsel under the Fifth Amendment.

Assuming, *arguendo,* the appellee was in custody at the 10 September and 17 September interviews with NCIS, he had not been in continuous custody. See *Grooters,* 39 M.J. at 275 (Crawford, J., concurring); *McNeil v. Wisconsin,* 501 U.S. 171, 176–77, 111 S.Ct. 2204, 2208, 115 L.Ed.2d 158 (1991). More importantly, the appellee had never invoked counsel in "the context of custodial interrogation," his references to counsel were at most anticipatory to a custodial interrogation, and these references were ambiguous. *United States v. Schroeder,* 39 M.J. 471 (C.M.A. 1994); *Jordan,* 35 M.J. at 859, citing *McNeil,* 501 U.S. at 182 n. 3, 111 S.Ct. at 2211 n. 3 (1991). Under these circumstances, SA Dortch was permitted to proceed with his interview of the appellee, he was permitted to clarify the appellee's intentions respecting the assistance of counsel, the appellee's waiver of the assistance of counsel at that interview was valid, and the appellee's subsequent confession should not have been suppressed on Fifth Amendment grounds. *Davis; McNeil; Schroeder; Jordan.*

### 3. Right to Counsel under the Sixth Amendment

■ The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." "The

4. In *Tempia,* the accused was apprehended, was advised of his right to counsel, was freed to seek counsel, was recalled to the OSI office 2 days later, stated he had not yet received counsel, was given an appointment with the base staff judge advocate who advised the accused of his rights but did not form an attorney-client relationship, and was returned to OSI where he waived his right to the assistance of counsel because it "didn't do me no good." *Tempia,* 16 C.M.A. at 632, 636, 37 C.M.R. at 252, 256.

purpose of the Sixth Amendment counsel guarantee—and hence the purpose of invoking it—is to 'protec[t] the unaided layman at critical confrontations' with his 'expert adversary,' the government, *'after* the adverse positions of government and defendant have solidified' with respect to a particular alleged crime." *McNeil v. Wisconsin,* 501 U.S. 171, 176–79, 111 S.Ct. 2204, 2208–09, 115 L.Ed.2d 158 (1991) (citing *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984)); *see also Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). The Sixth Amendment right to the assistance of counsel attaches "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information or arraignment." *McNeil,* 501 U.S. at 175, 111 S.Ct. at 2207 (quoting *Gouveia,* 467 U.S. at 188, 104 S.Ct. at 2297, and *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality opinion)). This Sixth Amendment right to counsel is both broader and narrower than the Fifth Amendment right: broader in the sense that it relates to more than custodial interrogations, yet narrower in the sense that it relates to interrogations regarding specific crimes. *See McNeil.* In the military, the Sixth Amendment right to counsel attaches at the moment charges are preferred against the suspect. *United States v. Wattenbarger,* 21 M.J. 41 (C.M.A.1985), *cert. denied,* 477 U.S. 904, 106 S.Ct. 3272, 91 L.Ed.2d 563 (1986); *United States v. Kelliher,* 31 M.J. 701 (N.M.C.M.R.1990), *aff'd,* 35 M.J. 320 (C.M.A.1992); Mil.R.Evid. 305(d) & analysis.

■ No claim was made by the appellee that his Sixth Amendment right to counsel was abridged, nor did the military judge make any findings with respect thereto. All of the contacts with NCIS occurred prior to charges being preferred; therefore, the ap-

pellee had no right to counsel under the Sixth Amendment.

**4. Right to Counsel under Mil.R.Evid. 305**

■ Congress has delegated to the President authority to prescribe rules of evidence in trials by court-martial. UCMJ art. 36(a), 10 U.S.C. § 836(a) (1988). The President has exercised that authority by promulgating the Military Rules of Evidence, which are set forth in the Manual for Courts-Martial, United ed States, 1984. Exec. Order No. 12473, 49 Fed.Reg. 17152 (1984), as amended.

Per Mil.R.Evid. 304, involuntary statements may not be received in evidence. "A statement is 'involuntary' if it is obtained in violation of the self-incrimination privilege or due process clause of the Fifth Amendment to the Constitution of the United States, Article 31, or through the use of coercion, unlawful influence, or unlawful inducement." Mil.R.Evid. 304(c)(3). Mil.R.Evid. 305 sets forth requirements on warning suspects concerning their rights. A statement is involuntary if it is obtained in violation of Mil. R.Evid. 305. Per Mil.R.Evid. 305(d), a suspect from whom a pretrial confession is sought must be warned of his right to consult with and have present at the interrogation counsel *if* the suspect "is in custody, could reasonably believe himself or herself to be in custody, or is otherwise deprived of his or her freedom of action in any significant way[,]" OR *if* the interrogation is conducted subsequent to preferral of charges or the imposition of pretrial restraint. Mil.R.Evid. 305(d)(1)(A), (B); R.C.M. 304. "Counsel" means a judge advocate, provided at no charge to the suspect. Additionally, the suspect may retain civilian counsel, at no expense to the United States. Mil.R.Evid. 305(d)(2).[5]

As noted earlier, the appellee was never in custody, could not have reasonably believed himself to be in custody, and was not otherwise deprived of his freedom of action in any significant way. Moreover, at the time of the interviews, the charge had not been pre-

---

**5.** The in-custody/*305(d)(1)(A)* counsel is the analog of Fifth Amendment/*Edwards* counsel, whereas the post-restraint/post-preferral/*305(d)(1)(B)* counsel is the analog of Sixth Amendment post-arraignment/post-indictment/*Massiah* counsel. *See* Mil.R.Evid. 305 analysis.

ferred against the appellee, and he had not been subjected to pretrial restraint. Therefore, *305* counsel rights did not obtain.

### 5. Notice to Counsel

■ We also observe that Mil.R.Evid. 305(e) provides that when a person who is required to give Article 31(b) warnings intends to question a suspect and knows or reasonably should know that counsel either has been appointed for or retained by the suspect with respect to that offense, the counsel must be notified of the intended interrogation and given an opportunity to attend before the interrogation may proceed. A statement obtained in violation of Mil. R.Evid. 305(e) is involuntary and inadmissible under Mil.R.Evid. 304. The *305(e)* notice requirement is triggered when the interrogator is required to give Article 31 rights and, therefore, applies even in non-custodial situations where there is no obligation to give a counsel rights warning. Here, no counsel was appointed for or retained by the appellee at the time.

We further note that according to the "drafters," the *305(e)* notice-to-counsel requirement was "taken from" *United States v. McOmber,* 1 M.J. 380 (C.M.A.1976). Mil. R.Evid. 305(e) analysis. In *McOmber,* the Court of Military Appeals held that

> once an investigator is on notice that an attorney has undertaken to represent an individual in a military criminal investigation, further questioning of the accused without affording counsel reasonable opportunity to be present renders any statement obtained involuntary under Article 31*(d)* of the Uniform Code. This includes questioning with regard to the accused's future desires with respect to counsel as well as his right to remain silent, for a lawyer's counseling on these two matters in many instances may be the most important advice ever given his client.

1 M.J. at 383 (emphasis added). Article 31(d) of the Code provides that "[n]o statement obtained from any person ... through the use of coercion, unlawful influence, or unlawful inducement may be received in evi-

dence against him in a trial by court-martial." 10 U.S.C. § 831(d) (1988). Thus, the Court of Military Appeals held that when counsel has undertaken to represent an accused in an investigation, unless that counsel is given an opportunity to be present, counsel's absence renders the subsequent confession inadmissible because it has been obtained through the use of coercion, unlawful influence, or unlawful inducement. However, the Court of Military Appeals has since held that *McOmber* rule does not apply a *per se* rule of exclusion, *United States v. Hill,* 5 M.J. 114 (C.M.A.1978); that it does not apply in the absence of an attorney-client relationship, *United States v. Quintana,* 5 M.J. 484 (C.M.A.1978); that it does not apply to anticipatory attorney-client relationships, *United States v. Littlejohn,* 7 M.J. 200 (C.M.A.1979) (per Cook, J., with one Judge concurring in the result); and, that it was based not only on Article 31, but also on Article 27, UCMJ, 10 U.S.C. § 827 (1988), which concerns the detailing of defense counsel in trials by general and special courts-martial, *United States v. Harris,* 7 M.J. 154 (C.M.A.1979); *United States v. Lowry,* 2 M.J. 55 (C.M.A.1976).

■ Here, the appellee by his own statement to the NCIS agents, had no attorney-client relationship. He did not have retained or appointed counsel. Charges had not been preferred against him or referred to trial by special or general court-martial. He had not been subjected to pretrial restraint, he was not in custody, and he expressly waived his right to counsel at the 17 September interview. Accordingly, neither Mil.R.Evid. 305(e), nor *McOmber* affords any basis for the suppression of his confession of that date.[6]

### 6. Coercion, Unlawful Influence, or Unlawful Inducement

■ The Due Process Clause of the Fifth Amendment, Article 31(d), and Mil.R.Evid. 304 all preclude the admission of pretrial confessions obtained through the use of coercion, unlawful influence, or unlawful inducement by police or military investigators. *See*

---

**6.** We also doubt the continuing validity of *McOmber* in light of the promulgation of Mil. R.Evid. 305(e) and developments in Fifth and

Sixth Amendment law since *McOmber.* It is, of course, the prerogative of the Court of Military Appeals to reassess *McOmber.*

Mil.R.Evid. 304(c)(3). "Confessions can be involuntary as a result of official coercion or overreaching, or by the failure of officials to secure necessary waivers of rights." *United States v. Norfleet,* 36 M.J. 129, 131 (C.M.A. 1992). However, "[a]bsent police conduct causally related to the confession, there is no basis for concluding a confession was involuntary...." *United States v. Jones,* 34 M.J. 899 (N.M.C.M.R.1992) citing *Colorado v. Connelly,* 479 U.S. 157, 164 & n. 2, 107 S.Ct. 515, 520 & n. 2, 93 L.Ed.2d 473 (1986); *see also Martinez,* 38 M.J. at 85 n. *.

▆▆▆▆ The principles for determining whether a confession was obtained through the use of coercion, etc., are essentially the same whether the challenge is based on the Constitution, the Code, or the Military Rules of Evidence. The principles may be summarized as follows:

(1) If the confession is the product of an essentially free and unconstrained choice by its maker, it may be used against him. If his will has been overborne and his capacity for self-determination critically impaired, the confession may not be used against him.

(2) Whether a particular accused's will has been overborne and broken must be decided on the peculiar, individual facts of his case.

(3) The totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation—must be assessed.

(4) Some of the factors to be taken into account include: the accused's age; his education; his intelligence; the advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; the use of physical punishment, such as the deprivation of food or sleep.

(5) The import of the factors vary according to the circumstances and the state of mind of the accused.

(6) The constituent elements of the interrogation leading to the confession may be reviewed separately, however, the circumstances should be evaluated together.

(7) Absent police conduct causally related to the confession, there is no basis for concluding a confession was involuntarily induced, and even where there is a causal connection between the actions of Government agents and an accused's confession, it does not automatically follow that the confession was involuntary.

(8) Ploys to mislead a suspect or lull him into a false sense of security do not render a statement involuntary, provided they do not rise to the level of compulsion or coercion.

(9) Ploys may play a part in the suspect's decision to confess, but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary.

*Jones,* 34 M.J. at 906–07 (citations and quotations omitted).

▆▆▆ We note the military judge made no findings respecting the use of coercion, unlawful influence, or unlawful inducement. Instead, he based his conclusions on the deprivation of counsel under Article 31(b). We have, therefore, independently examined the record on this question, and we find no basis in fact to conclude that the confession given by the appellee was obtained through coercion, unlawful influence, or unlawful inducement. We note, however, that in *Martinez,* the Court of Military Appeals held in facts similar to the appellee's that the Army Court of Military Review erred in reversing the trial judge because there was evidence of record to support the military judge's finding that the accused's statement had been obtained through coercive police activities. It noted the "Mutt and Jeff"-type routine apparently employed. More importantly, it specifically credited the military judge's essential findings wherein he gave great weight to Martinez' testimony. Here, there was no such interrogation technique employed, and the appellee never testified. To the contrary, the record before us evidences no coercive police activities. Nothing done by the NCIS agents appears to have been overbearing or exploitive. True, SA Dortch confronted the appellee on the truth of his denials, but an adjuration to speak the truth is entirely proper and does not constitute an im-

proper inducement. *See United States v. Wheeler*, 22 M.J. 76 (C.M.A.), *cert. denied*, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986).

It is also true that the NCIS agents advised the appellee of rights to counsel that under the circumstances he did not have. The omission of that advisement has been held to result in an involuntary confession; however, the appellee has cited no authority for the proposition that the giving of that advisement, though unnecessary under the circumstances, has the same result. Surely, had the advisement not been given, the appellee would have contended that the confession was involuntary because it was omitted.

Any confusion the appellee was laboring under respecting the extent of his rights to counsel cannot be laid at the feet of the NCIS agents. They prudentially informed the appellee of the panoply of his potential rights. The fact that one of the rights was not truly available to the appellee did not betoken police coercion, particularly in the absence of any reasonable suggestion the NCIS agents were out to muddle the mind of the appellee in some fashion. Under the circumstances, the advice respecting counsel need not have been given. We doubt the appellee would have exercised his other rights differently had the counsel advisement been entirely omitted as it could have been.

In any event, the appellee was, nonetheless, able to consult with an attorney. While we give considerably less credit to counsel that is short of that which one may receive in an attorney-client relationship, we find the appellee was not entirely without guidance. In particular, he was apparently counselled to steer clear of NCIS, particularly if he had something about which to be concerned. Reiterating, we doubt the appellee would have exercised his other rights any differently had this guidance been entirely unavailable to him.

We also cannot vouch for the military judge's assumption that the law requires investigators to procure counsel for the accused. We are unaware of any such requirement. The requirements as we understand them extend only to advisement of the accused of his rights, securing necessary waivers, and notification of counsel of the intended interrogation when required under Mil. R.Evid. 305(e) and *McOmber*.

Finally, we note that the record is not devoid of any clue as to the appellee's motivation for confessing. Rather than police coercion, his motivation for confessing appears to have been to get the matter off of his chest. His decision was a product of appellee's own balancing of competing considerations, and his motivation should be recognized for what it is—a matter personal to the appellee and not something to be ascribed to NCIS.

Accordingly, we find *Martinez* to be distinguishable on its facts, and we conclude that a finding that the appellee's will was overborne or his capacity for self-determination critically impaired by official coercion, would have been clearly erroneous. Accordingly, we find no basis in fact for concluding the appellee's confession was procured through the use of coercion, unlawful influence, or unlawful inducement by police or military investigators.

### 7. Pretrial Ineffective Assistance of Counsel

 It has been recognized that an accused may raise a challenge to his court-martial proceedings on the basis of ineffective assistance of counsel, including pretrial ineffective assistance of counsel. *United States v. King*, 27 M.J. 664 (A.C.M.R.1988), *aff'd*, 30 M.J. 59 (C.M.A.1990). A prerequisite to such a claim is, at a minimum, that an attorney had undertaken representation or that the accused was erroneously denied the assistance of counsel to which he was entitled. Here, no counsel had been appointed for or retained by the appellee, and no counsel had otherwise undertaken his representation. Therefore, there is no counsel about whose assistance the appellee may complain. Instead appellee in effect complains that LT Kelly did not form an attorney-client relationship to which the appellee was entitled. As we have discussed, the appellee was not entitled to form such a relationship under these circumstances.

 We cannot, however, leave this subject of representation without expressing some concern for the lack of evidence con-

cerning the standards for assignment of counsel and the lack of official confirmation that the appellee requested counsel of the NLSO, was seen by counsel there, and the nature of the relationship. We must content ourselves with LT Kelly's ambiguous statement and the appellee's representations, as testified to by SA Cacciaroni. In any case, when an accused is entitled to *Tempia* counsel, such requires the appointment of "a lawyer who is peculiarly and entirely the accused's own representative; who owes him total fidelity; to whom full disclosure may be safely made in a privileged atmosphere; and from whom [the] accused can learn with confidence a proper course of action." *Tempia,* 16 C.M.A. at 639, 37 C.M.R. at 259. The kind of limited relationship provided the appellee does not satisfy *Miranda. King,* 30 M.J. at 68. For example, had the scenario been more akin to *King,* viz, a custodial interrogation terminated by invocation of counsel, followed by frustrated attempts to secure *Tempia* counsel, pretrial restriction, transport from Germany to the United States in custody, confinement, re-interrogation and a confession, the matter might demand a different result. Who is seen, upon what basis they are seen, and the nature of the relationship formed should not be a matter of conjecture. Unfortunately, the headquarters guidance on this subject is as vague as LT Kelly's statement, and the local directive was not placed in evidence. NAVLEGSVCCOMINST 5450.1D, Mission and Function of Naval Legal Service Offices (14 Aug 1991); NAVLEGSVCCOMINST 5800.-1B, Naval Legal Service Office Manual, encl. (1), ¶¶ 0301a(3), 0614c (10 Mar 1988). While we reverse the military judge's ruling in this case, we also believe it prudent to invite Commander, Naval Legal Service Command's attention to the problem identified herein.

### Disposition

Accordingly, we reverse the military judge's ruling suppressing appellee's pretrial confession (Appellate Exhibit XI), order the appellee's pretrial confession to be admitted subject to corroboration (Mil.R.Evid.

304(g)(2)), and return the record for a trial on the merits.

Senior Judge WELCH and Judge DeCICCO concur.